UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY MAURICE BELFIELD,<br><br>    Petitioner,<br><br>    v.<br><br>BRIAN KIBLER,<br><br>    Respondent. | Case No. 21-cv-01838-HSG (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the petition for a writ of habeas corpus of Petitioner Tony Maurice Belfield, brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction. Dkt. No. 1. Respondent has filed an answer to the petition, Dkt. No. 17 and Petitioner has filed a traverse, Dkt No. 25. For the reasons set forth below, the petition is DENIED.

## I.    PROCEDURAL HISTORY

On October 27, 2016, Petitioner was convicted by a Contra Costa County jury of second-degree murder, shooting at a person from a motor vehicle, and unlawful possession of a firearm. Dkt. No. 17-4 at 115-18. The jury also found true the allegations that Petitioner discharged a firearm causing great bodily injury or death. *Id*. The court found true two prior strike convictions, one prior serious felony conviction, and two prior prison terms. Dkt. No. 17-7 at 4. Petitioner was sentenced to a total term of 75 years to life in prison. *Id*. at 6.

Petitioner appealed, and on November 29, 2017, the California Court of Appeal affirmed the judgment of conviction, but remanded to the trial court to consider whether to strike the 25-year firearm enhancement.[1] *People v. Belfield*, No. A149964, 2018 WL 6251390, at *1 (Cal. Ct.

---

[1] On remand, the trial court struck the 25-year firearm enhancement but declined to consider Petitioner's additional request to strike the prior felony enhancement. *See* Dkt. No. 20-7.

United States District Court
Northern District of California

1    App. Nov. 29, 2018).  The California Supreme Court summarily denied a petition for review on

2    February 27, 2019.  Dkt. No. 20.  Petitioner filed a federal habeas petition on September 18, 2019,

3    which was dismissed on the ground that state proceedings were pending.  *See* Case No. 19-cv-

4    05819, Doc. 20.

5         On or about March 16, 2021, Petitioner filed this federal habeas petition.  Dkt. No. 1.

6    ## II.    STATEMENT OF FACTS

7         The following factual background is taken from the November 29, 2017 opinion of the

8    California Court of Appeal.[2]

9    ### Christopher Monico Is Shot

10   In January 2015, Richard Ludlow and his friend Christopher Monico
     moved into an apartment shared by Belfield, Belfield's girlfriend Kim
11   Saunders, and a few other individuals.  Ludlow, Monico, Belfield and
     Saunders got along and often spent the day together.  Ludlow never
12   had conflicts with Belfield or Saunders, but on one occasion in
     February Belfield and Monico had to be pulled apart after they almost
13   got into a fistfight.  Later they resolved the dispute and "hugged it
     out."
14
     Ludlow testified that Belfield claimed he heard voices.  Belfield once
15   said he thought Ludlow was saying something negative to him under
     his breath, when Ludlow had not said anything.  A week or two before
16   the murder Belfield "was in the house, and he was acting like there
     was people outside trying to get him, trying to kill him" and yelling
17   at people who were not there.  But on the day of the shooting Belfield
     did not appear to be hallucinating or hearing voices.  To the contrary,
18   he spoke coherently, made sense and "was showing full
     comprehension," although he was more quiet and distant than usual.
19
     On March 2, 2015, Belfield and Saunders left the apartment between
20   9:00 and 11:00 a.m.  Ludlow and Monico started to walk to a nearby
     Denny's for breakfast, but two men drove past them and made a U-
21   turn.  One of the men was whistling "and they ... acted like they were,
     like, watching us."  Monico ran into a restaurant.  The car drove away.
22

23   _____

24   Petitioner appealed, and on June 19, 2020, the state appellate court again remanded to allow the
     trial court to consider whether to strike the serious felony enhancement.  *Id*.  The trial court
25   declined to strike the enhancement, Petitioner appealed, and the state appellate court affirmed on
     April 22, 2021.  Dkt. No. 20-9.

26   [2] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. Daniel*, 853
27   F.3d 1049, 1052-54 (9th Cir. 2017).  Based on the Court's independent review, the Court finds
     that it can reasonably conclude that the state court's summary of the facts is supported by the
28   record, and that this summary is therefore entitled to a presumption of correctness, unless
     otherwise indicated in this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

Ludlow called Belfield and Saunders and told them about the encounter. Belfield and Saunders returned to the apartment around 1:00 or 2:00 p.m. They "wanted to go look for the people ...," so Ludlow and Monico got into Saunders's car. Saunders drove, and Belfield was in the front passenger seat. He had a shotgun. They drove around for a while and returned to the apartment around 10:00 p.m.

Saunders and Belfield dropped Ludlow and Monico off at the apartment and drove away "to go handle something else." Monico told Ludlow to stay in the apartment until someone came to get him.

Ludlow dozed off and awoke to Belfield and Saunders "honking and screaming my name out from the car." He went outside, and they told him to get in the car. Saunders was driving, with Belfield still in the front passenger seat. Saunders asked Ludlow where Monico was, said he was "acting weird" and asked if he "was trying to set them up" to get robbed or killed. Ludlow said he did not know where Monico was and that Monico was "not that type of person" to set them up.

They drove to a 7-Eleven, where Ludlow got out to buy Saunders a Slurpee. When he got back to the car she and Belfield said Monico had called and reported that 45 minutes earlier the men who drove by earlier that day had been seen going into an apartment on Hudson Court. Saunders asked Ludlow why it took Monico 45 minutes to call them. Ludlow explained that Monico's phone was in Saunders's car.

Saunders drove to a parking lot and moved to the rear seat on the driver's side. She and Belfield directed Ludlow to get in front and drive to Hudson Court.

Ludlow complied. As he pulled into Hudson Court, Saunders and Belfield told him to make a U-turn, pull over by the sidewalk and turn off the car and headlights. As Ludlow was making the U-turn he saw Monico about 17 feet away, running toward the car. Monico was illuminated by the car's headlights. Ludlow remarked that Monico was running to the car. Saunders and Belfield asked him why. Ludlow responded, "Because he was trying to get in the car."

Belfield told Monico through the open car window to "get back." As Ludlow described the events, Monico "clearly announced himself with his hands up," saying, " 'it's me, it's Keko.[FN] He's, like, 'It's just me, just calm down,' and [Belfield] just kept telling him to get back." Ludlow could clearly see Monico, who was now within 6 feet or less from the car. Ludlow asked Belfield what he was doing. Belfield shot Monico at close range, killing him.

Saunders and Belfield yelled at Ludlow to drive away. Ludlow complied, but a police car followed them. As Ludlow was stopped at a red light he saw the police car behind him and heard approaching sirens. With Belfield and Saunders "screaming at me to drive away, and ... saying, 'drive,' 'drive,' 'drive,'" Ludlow ran a red light and sped off down Somersville Road. Belfield or Saunders threw the gun out of the car. Ludlow "was scared that if I would have got away, I would have been next to be killed," so he intentionally crashed the car into a house. When police arrived at the scene Belfield and Saunders

3

pretended to be sleeping in the back seat.  Belfield was wearing a camouflage print mask around his neck.

Police found two live shotgun shells and a 12-guage shotgun with a spent shell in the chamber on Somersville Road.  Belfield was later found to be a major source of DNA recovered from the gun.

. . .

Ludlow was interviewed by police the day after the shooting.  He described the incident with the strangers who whistled at him and Monico the previous morning and the events leading up to the shooting and crash.  At first Ludlow denied he knew the shooter's identity, but he eventually told police that Belfield shot Monico and threw the gun out of the car window.  Ludlow did not know why.  He explained, "There's some like—like with [Belfield] there's—there's different levels to [Belfield].  He has to get medicine, you know, 'cause he hears voices in his head.  You know, from me being around him for the past couple months he's, you know, he—he's like he hears voices and he hears people talking to him and talking stuff to him."

**Belfield's Call to Saunders from Jail**

In a March 12, 2015 telephone call from jail, Belfield reassured Saunders that they would be together and "[t]hat's why I'm going to go insanity. . . . All you got to do is stay doing what you doing.  Stay out of trouble.  Stay doing, stay doing, stay doing your womanly duties and I'll make sure I get out."  Because Saunders had told reporters the shooting was an accident, she asked Belfield, "'Did I just fuck up?'"  Belfield responded, "You didn't fuck up.  If I can't get up under what I'm trying to get up under that's going to work."

Belfield testified on cross examination that when he told Saunders he was "going to go insanity," he meant he "was trying to go to the hospital" because he was having an episode of mental illness.

**The 2009 Shooting**

In 2009, Belfield was arrested after a shooting at a Richmond apartment complex.  Responding officers found the victim on the ground with a gunshot wound to his upper back.  A blood trail led back to an apartment where a bolt-action rifle was hidden under a sofa.

When Belfield was apprehended and questioned by police, he said he did not know anything about the shooting, was not there when it happened, and did not have a gun that day.  He also said the victim was trying to set him up or "do something" to him.

Belfield was charged with assault with a firearm.  In 2011 he plead guilty to negligently discharging a firearm.

**Belfield's testimony**

Belfield testified at trial.  When asked about the 2009 shooting, he said he shot the victim, Worsten Andrews, "[b]ecause I was paranoid. [¶] ... [¶] Me, knowing him, I thought he was going to kill me or something or shoot me."  The two previously had "some kind of problem" with each other when they were incarcerated at Corcoran State Prison.  Belfield had seen Andrews with a gun a few days before the shooting.  He thought Andrews was armed the day of the shooting because he was carrying a backpack everywhere he went.

Belfield said he got along well with Andrews until a few minutes before the shooting, when he felt Andrews "was trying to disrespect" him.  Andrews was holding his backpack at the time, but he was not reaching into it.  Belfield testified he was paranoid about Andrews because of their history and "what I know he's capable of doing," not because of his own mental issues.  He retrieved his gun from a nearby alley and shot Andrews in the back of the neck.  Afterwards he tried to hide his gun under a sofa so he could "get away" and "not get caught."  Belfield lied to police about his actions because he "was trying to get away with it."

Belfield testified about an incident that occurred a few days before he shot Monico.  He and Monico had driven into Hudson Court to see a friend when Monico "got into a staring contest" with a stranger. Belfield decided to leave.  As they drove away Monico yelled at the stranger, "'I got your license plate number,'" meaning "[w]e can find you."  Belfield heard shots coming from behind as he sped off.  He never saw the stranger again.

On cross-examination, Belfield testified he was unable to discern the stranger's age, race or appearance.  He explained, "It was dark."  He could not see the man's face, but he could tell from his "body positioning" that he was staring at Monico.  Belfield did not report this incident to police.

Belfield had been diagnosed with schizophrenia and took Haldol because he was paranoid and "sometimes . . . heard[ ] voices and [saw] things."  When he experienced paranoia it seemed "like people really be after me or going to do something to me at the moment.  [¶] ... [¶] I just sense it.  It's just something that happens."  His medication helped, but sometimes he didn't take it because it made him tired and "I just don't want to."  He was symptomatic the day he shot Monico and was hearing voices that said they were going to kill him.  His doctor injected him with Haldol that morning, but the medication takes a few days to take effect.

Later that day Ludlow called Saunders and said the men who shot at Belfield and Monico a few days before had "rolled by them."  That was a problem because it seemed the men were looking for him, Monico, Ludlow and Saunders.  So, that evening the four of them drove around "looking to see if we could find the dudes that shot at us a few days before then."  Belfield got a shotgun shortly after the incident at Hudson Court.  He put it in the car, loaded, because he was "[k]ind of scared a little bit about if we ran into these dudes, what was going to happen."  He explained, "I wasn't intending to shoot them off the top like that.  I was trying to see what is up with them first." But he was feeling paranoid.

Eventually he and Saunders dropped Monico and Ludlow off at the apartment and continued to drive around. After a while they returned to the apartment. Saunders called Ludlow out to the car and asked him about Monico. They were worried about him "[b]ecause the dudes that shot at us. I guess they've been driving around the neighborhood lately." Belfield denied that he thought Monico was trying to set them up or that Saunders was worried about it. Later at the 7-Eleven, Saunders received Monico's phone call and told Belfield that he had "seen the guys that shot at us roll through Hudson Court about 45 minutes ago." Saunders and Belfield got in the back seat and told Ludlow to drive to Hudson Court. Belfield put his gun on the floor next to him.

When they arrived, Ludlow made a U-turn and parked. The car's windows were tinted, and Belfield could not see out of them. He heard someone ask, "'Who is that running up on the car?'" but he could not remember whose voice it was or whether it was a man or a woman. Belfield rolled his window down and reached for his gun. He testified, "I aimed it out the window, and as soon as I seen a body sculpture, I shot." He could not tell who it was. He did not hear the person running up to the car say "[w]hoa" or "Uncle Ton, it's me" and did not hear anyone say it was Monico. Belfield did not say anything like "'Step back'" and Ludlow did not say "What are you doing?" Belfield fired at the approaching figure because "I was scared. I was paranoid. I thought it was the same guys that shot at us a few days ago."

Belfield remembered driving away, running a red light, throwing the gun out of the car and crashing into a house. He was hearing voices. The camouflage mask was around his neck, but he hadn't used it to cover his face. He "didn't really have no reason" why he wore it. He was not sure why he and Saunders pretended to be asleep when the police arrived. His thinking was "[n]ot really" clear that night. He felt bad about shooting Monico "[b]ecause he was a friend, and I never want to hurt him."

Belfield did not remember Saunders raising suspicions about the 45-minute gap between when Monico saw the men at Hudson Court and called her. He did not hear her ask if Monico was setting him up. When someone asked who was running up to the car he rolled his window down, picked up the gun and held it out of the window. He saw the shape of a person running toward the car, but he did not see any weapons. He said, "I couldn't see nothing. I shot as soon as the person appeared." He meant to fire at and hit the person, but he said "I'm not sure to say if I was trying to kill somebody. I know I was trying to make sure we were all good." He did not tell Ludlow to drive off. He and Saunders pretended to be asleep when they crashed because he did not want to be held responsible for throwing the gun out of the car.

**Psychiatric Evidence**

Psychiatrist Dr. Renée Luburic testified as a defense witness. Dr. Luburic treated Belfield for schizoaffective disorder, depressive type, from June 2013 through March 2015. Typical symptoms are

hallucinations, delusions, paranoia and depression.

Saunders brought Belfield to see Dr. Luburic on March 2. He was very guarded, experiencing auditory hallucinations, and appeared "paranoid, tired, maybe depressed." Saunders told Dr. Luburic that Belfield had been hearing voices and experiencing paranoia and insomnia. He had not been taking his medication. He was given a shot of Haldol, an antipsychotic. The formulation he received is released slowly into the body and does not take effect immediately.

On cross-examination Dr. Luburic testified that Belfield's mental illness does not affect his ability to hear, except to the extent he might be distracted by audial hallucinations. On March 2 his symptoms were fairly significant, but not so severe as to require hospitalization or an emergency evaluation. Nothing Dr. Luburic observed suggested that Belfield might shoot someone.

*Belfield*, 2018 WL 6251390, at *1-5.

## III.    DISCUSSION

### A.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[3] In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)). Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA. *Id.* at 102.

**B.    Petitioner's Claims**

Petitioner raises the following claims in this federal habeas petition:  (1) the trial court

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

erred in instructing with CALCRIM 3428, and trial counsel was ineffective in failing to object; (2) the trial court erred in answering the jury's request for clarification of the mental impairment instruction, and trial counsel was ineffective in failing to object; (3) the prosecutor committed misconduct in violation of *Griffin v. California* and *Doyle v. Ohio* when the prosecutor argued to the jury that it should disbelieve Petitioner's self-defense testimony because Petitioner did not tell the police that he fired in self-defense; and (4) the trial court erred by not providing a pinpoint instruction to the jury on both regular self-defense and imperfect self-defense, and trial counsel was ineffective in failing to object. *See generally* Dkt. No. 1 at 3-20.

### 1. Claim No. 1: Instructional Error & Ineffective Assistance of Counsel

In Claim No. 1, Petitioner argues that the trial court erred in instructing the jury on mental impairment [CALCRIM No. 3428], because the instruction limited the extent to which the jury could consider evidence of Petitioner's mental illness. *See* Dkt. No. 1 at 5-14. Specifically, he argues that the instruction: (1) "prohibited the jury from relying upon petitioner's mental disease in determining whether he acted in imperfect self-defense"; (2) "improperly prohibited the jury from using the evidence of petitioner's mental disease to determine his credibility"; (3) "improperly prevented the jury from using the evidence of petitioner's mental disease to determine whether he could perceive and recollect accurately"; and (4) "improperly prevented the jury from using evidence of petitioner's mental disease to evaluate his behavior at times other than 'at the time of the charged crime'". Dkt. No. 1 at 13. Petitioner also contends that trial counsel was deficient in failing to object to the language in the instruction.

The California Supreme Court summarily rejected the claims. The California Court of Appeal rejected the claims as follows:

> Belfield asserts the court erred when it instructed the jury with CALCRIM No. 3428 that it was to consider evidence of his mental disease or disorder "only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted or failed to act with the intent or mental state required for that crime." [FN] He

maintains that, as given, the instruction improperly prevented the jury from considering his mental illness in (1) determining whether he committed voluntary manslaughter, via imperfect self-defense, rather than murder; (2) evaluating his veracity and ability to perceive and recollect accurately; and (3) evaluating his statements and behavior at times other than the very moment he shot Monico, including the hours leading up to the murder and the shooting in 2009. . . .

. . .

The trial court instructed the jury with CALCRIM No. 3428 as follows:

"You heard evidence that the defendant may have suffered from a mental disease or disorder. You may consider this evidence *only for the limited purpose of deciding whether at the time of the charged crime the defendant acted or failed to act with the intent or mental state required for that crime.*

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first-degree murder.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required malice aforethought. If the People have not met this burden, you must find the defendant not guilty of second-degree murder." (Italics added.)

**Analysis**

Belfield asserts the italicized language limiting the purpose of the evidence precluded the jury from considering whether his mental illness was "a contributing factor to his commission of another crime, voluntary manslaughter" because it limited the psychiatric evidence to "the charged crime" of murder. Thus, he maintains, the instruction prevented the jury from considering whether his paranoia caused him to shoot Monico in an actual but unreasonable belief in his need to act in self-defense. Not so.

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) Here, while murder was the "charged" crime, [FN] the jurors were also instructed that manslaughter is a lesser included offense of murder and that, if they found the killing was not legally justified, they must decide whether the crime was murder or voluntary manslaughter. [FN] Belfield's supposition that the jurors, under these instructions, would interpret CALCRIM No. 3428 to prohibit their consideration of Belfield's mental illness in deciding the possibility of imperfect self-defense manslaughter flies in the face of common

sense.

In any event, Belfield acknowledges the evidence of his mental illness was directly relevant to his defense of unreasonable self-defense, specifically, whether at the time of the killing he had an actual but unreasonable belief that he was being threatened with the immediate use of deadly force. Belfield asserted at trial that he lacked malice aforethought because his paranoia caused him to have such an actual but unreasonable belief in the need to defend himself with deadly force. (*See In re Christian S.* (1994) 7 Cal.4th 768, 773 [" 'An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter' "], italics omitted.) The jury was properly instructed that the People had to prove malice aforethought beyond a reasonable doubt, that "[t]he People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense," and that "[i]f the People have not met this burden, you must find the defendant not guilty of murder." Accordingly, the jurors were properly instructed that they could only convict Belfield of murder if the People proved beyond a reasonable doubt that he did not shoot Monico in unreasonable self-defense. To decide whether Belfield was guilty of murder ("the charged crime"), then, the jury necessarily had to consider the evidence supporting his defense that his paranoia and schizophrenia caused him to actually but unreasonably believe he needed to shoot to defend himself. His contention that the instruction precluded them from doing so is meritless.

By the same token, Belfield asserts that limiting the jury's consideration of his mental illness evidence to the "charged offense" prevented the jury from considering his paranoia when it assessed his testimony that he thought the man who ran up to the car was one of the strangers who had threatened him and his friends. He argues his mental illness interfered with his ability to accurately perceive and understand the events taking place around him and therefore "should have been usable to help explain how [he] could hold such a belief, and have it be honest even if, arguendo, it was inaccurate or unreasonable. Evidence of appellant's mental illness should have been usable to help explain how he could be telling the truth about something that was not accurate."

CALCRIM No. 3428 did not prevent the jury from doing so. The jury was told to use the mental illness evidence only to assess whether Belfield acted with the mental state required for the charged crime when he shot Monico. But that determination depended in large part on what the jurors made of the truthfulness and accuracy of his testimony about his perception of the shooting and preceding events, issues on which the mental illness evidence was directly relevant. As defense counsel argued, "an episode of paranoia can disrupt your thinking, your judgment, your decision-making, makes you impulsive, makes you act rashly, makes you perceive danger, or makes you perceive situations that are dangerous, more dangerous than they really are." To infer in this context that the jurors would have understood CALCRIM No. 3428 to prohibit them from considering Belfield's schizoaffective disorder in deciding whether to

believe his version of the shooting stretches credulity past its breaking point. Moreover, in assessing credibility the jury was instructed it could consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."

Belfield similarly argues that by limiting the jury's consideration of his mental illness to " 'the time of the charged crime,' " the given instruction "improperly prevented the jury from using evidence of [his] mental disease to evaluate his behavior at times other than 'at the time of the charged crime.' " In his view, the instruction thus prevented the jury from considering his schizoaffective disorder in (1) determining why he was driving around with a shotgun earlier that day; (2) assessing the truthfulness of his testimony about hearing gunshots a few days prior "even if, arguendo, that noise was something else, such as a car backfiring;" and (3) evaluating the 2009 shooting. Again, we disagree. Belfield's behavior earlier the day of the murder, several days earlier, and during the 2009 incident were relevant as circumstantial evidence of his mental state when he shot Monico. The given instruction in no way barred the jury from considering Belfield's mental illness to inform its understanding of those events and, by extension, any light they could shed on his state of mind at the time of the murder.

In short, it is not reasonably probable on this record that the instruction prevented the jury from considering the evidence of Belfield's mental illness in considering whether he committed manslaughter rather than murder, evaluating his credibility, or assessing the significance of other events and acts as circumstantial evidence of his state of mind when he shot Monico. (*See People v. Solomon*, *supra*, 49 Cal.4th at p. 822.) The instruction was proper.

*Belfield*, 2018 WL 6251390, at *5-8.

The state's court's denial of this claim was not objectively unreasonable. Claims of error in state jury instructions are generally matters of state law only and thus not cognizable on federal habeas review. *See Gilmore v. Taylor*, 508 U.S. 333, 344 (1993). To obtain federal relief based on errors in the jury charge, a petitioner must show that the erroneous instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Jury instructions must be considered by a federal habeas court in their entirety, and not in isolation. *Id.* (citation omitted). The challenged instruction must be more than merely erroneous; instead, a petitioner must show there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citations omitted). Moreover, even if instructional error is

found to rise to the level of a constitutional violation under this standard, federal habeas relief is unavailable unless "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

As the state court explained, it is not reasonably likely that the jury would have interpreted the mental impairment instruction in the way Petitioner contends. Regarding the jury's ability to consider Petitioner's mental impairment in the context of imperfect self-defense, the jury instruction as a whole made it clear that to find Petitioner guilty of murder, *i.e.*, "the charged crime", the state was also required to prove that Petitioner was not acting in imperfect self-defense. *See* Dkt. No. 18-9 at 77 ("The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense . . . [i]f the People have not met this burden, you must find the defendant not guilty of murder"). To do so, the jury was instructed to consider all relevant circumstances in Petitioner's use of deadly force, and whether his belief in the need to use deadly force was unreasonable: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and/or appeared to the defendant." *Id.* at 76. Based on these instructions, the jury was not precluded from considering all the relevant circumstances, including Petitioner's mental impairment.

By that same logic, to find Petitioner guilty of murder, the jury was instructed that it must find he had the requisite mental state, *i.e.*, malice aforethought, at the time he shot the victim. *Id.* at 72-73. This determination hinged on the jury's assessment of the accuracy of Petitioner's recollections, the veracity of his testimony, and the jury's perception of Petitioner's beliefs both before and during the shooting. Thus, as the state court reasonably concluded, the given instruction did not preclude the jury from considering Petitioner's mental disease for those purposes. Viewing the jury instructions as a whole, the Court finds that the mental impairment instruction did not infect the entire trial so that the resulting conviction violated due process. *See*

13

*Estelle*, 502 U.S. at 72.

With respect to the claim of ineffective assistance of counsel, because the instruction itself was not improper, any objection by Petitioner's counsel would have lacked merit.  Counsel's failure to raise a meritless objection does not support a finding of ineffective assistance of counsel.  *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.")  The state court's denial of these claims was not contrary to or an unreasonable application of Supreme Court authority, or an unreasonable determination of the facts.  Habeas relief is denied on Claim No. 1.

**2.   Claim No. 2: Trial Court Error & Ineffective Assistance of Counsel**

In Claim No. 2, Petitioner contends that the trial court erred in its response to a question by the jury asking for clarification of the mental impairment instruction.  Dkt. No. 1 at 14.  He also argues that counsel was deficient in acquiescing to the judge's handling of the jury question.  The California Supreme Court summarily rejected the claims.  The California Court of Appeal laid out the relevant background and rejected the claims as follows:

> During deliberations the jury asked the trial court: "Is there any kind of clarification the jury can receive regarding how and when they are allowed to consider the defendant's mental illness?  The jury is struggling with the description provided in the instructions."  Outside the jury's presence, the court told counsel it was considering four potential responses: (1) stating it could provide no further clarification; (2) identifying the instructions that might bear on the issue; (3) identifying the particular portions of those instructions that might bear on the issue; and (4) giving additional instructions.  The court indicated its inclination was to provide no further clarification.  It explained, "I would tell them, in essence, that there are a number of instructions that speak to this issue. [¶] I'm not going to identify those instructions because to engage in that, I think I want to be very [wary] of kind [of] pointing them in a particular direction.  So I would say something to the effect, I'm not going to identify the instructions, because I'm confident that they are capable of identifying which instructions they are."  The court expressed concern that giving a pinpoint instruction "could be perceived as I'm nudging them in a particular direction, which obviously I cannot be portrayed as doing so."
>
> The prosecutor agreed.  He explained he did not think giving pinpoint instructions was wise "because, you know, the defendant's mental illness could kind of permeate to almost every instruction that's here.

To pinpoint specific instructions, it will just create more issues than it's worth.  Where the Court is at now I think is actually the appropriate remedy."  Moreover, he added, the jury's question "is extremely broad.  It's not specific to count, enhancement, any of those things of that nature.  That's why I think it's a bad requested [ sic ] idea to give any specific instructions on anything."  The court agreed but declined to invite the jury to submit more specific questions on the topic.  It elaborated: "I think I need to still stay clear of this.... My first impulse was to try to draw down on the instructions.

"Clearly I didn't want to give all of the instructions again, but one of the things that occurred to me—let's just say that we could agree amongst ourselves as to which instructions have any bearing on this at all.  Let's say that we did hypothetically, then would I not be remiss in not giving the reasonable doubt instruction along with that?

"If you start to go down that road, then does it not bring in everything else?  I think the better view upon reflection ... is to keep it as broad and as general and as neutral as I can make it."

The prosecutor renewed his suggestion that the court inform the jury that its question was too broad.  The court responded, "The trouble is if I say to them it's too broad, I don't want them to get any sense that I am being critical of what they are doing.  I have to be exceedingly careful about what I say. [¶] ... [E]very once in a while, I get a glimpse of how much emphasis a jury can place on a judge's reaction, comments to a situation.  Things are sometimes read into what I might appear to be saying that were never intended by me. [¶] I'd like to believe the hallmarks of my career has been exceedingly careful in that regard, especially in this case, but especially given what is at stake here, I want to tread as lightly as I can."

Defense counsel stated: "I think the Court's proposed course is correct."  The court then said it would reply to the jury's question in open court rather than by note.  Defense counsel responded, "I'll submit that issue.  I don't think it's wise to invite or suggest that—invite additional questions or suggest that there's somehow—we need to clarify something for us.  I think that we certainly can't draw their attention to specific instructions."

The court told the jury: "I cannot offer you any additional clarification.  There are a number of instructions that speak to this issue.  I'm not going to identify the particular instructions because I'm confident that you are already aware of which instructions they are. [¶] And then the last comment I will make: With respect to any instructions that you consider, you also keep in mind that all of the instructions that you were given are to be considered in making any determination that you make. [¶] Now, that may be less than satisfactory in terms of what you are requesting of us, but that is as far as I can go.  I cannot say anymore on that particular subject."

The jury returned its verdict the next afternoon.

**Analysis**

"The trial court has the primary duty to help the jury understand the

legal principles it is asked to apply. [Citation.] In *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 ..., the Supreme Court held that section 1138 imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury. [Citations.]' However, the standard does not require trial court elaboration on the standard instructions in every instance.  When the original instructions are full and complete, the trial court has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Jury questions can present a court with particularly vexing challenges.  The urgency to respond with alacrity must be weighed against the need for precision in drafting replies that are accurate, responsive, and balanced.  When a question shows the jury has focused on a particular issue, or is leaning in a certain direction, the court must not appear to be an advocate, either endorsing or redirecting the jury's inclination.  Although comments diverging from the standard should be embarked on with care, a trial court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331, citing *People v. Beardslee* (1991) 53 Cal.3d 68.)

Here, we need not decide whether the court erred in declining to provide further explanation in response to the jury's question, because Belfield's trial counsel forfeited the claim of error when she acquiesced to the court's decision ("I think the Court's proposed course is correct."). (*People v. Salazar* (2016) 63 Cal.4th 214, 248 (Salazar ) ["We have held that counsel's affirmative agreement with the court's reply to a note from the jury forfeits a claim of error"]; *People v. Debose* (2014) 59 Cal.4th 177, 207.)  Here, as in *Salazar*, "defense counsel did not take the opportunity to suggest an alternative. [Her] endorsement of the court's proposal effectively foreclosed further exploration of possible responses to the jury's question." (*Salazar* at pp. 248-249.)  Belfield tries to characterize his attorney's comment as "merely a polite way of acknowledging the trial court's intention," but his point is belied by the record.  This claim, therefore, is not preserved for appeal.

Belfield contends the issue is appropriately before this court because defense counsel's failure to object to the court's response constituted ineffective legal representation.   "To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)  "If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp* (1998) 18 Cal.4th 349, 366; *Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*).)

Even if we assume the court could properly have acceded to some

undefined defense request to elaborate on the mental illness evidence instruction, Belfield cannot show a reasonable probability that the failure to do so affected the verdict. Even now, as in the trial court, Belfield fails to specify what response he believes the court should have given beyond asking the jury to narrow its question, and there is no way of knowing how the jury would have responded if the court had taken that step. Beyond that, Belfield's claim of prejudice rests on his arguments that the court misinstructed the jury under CALCRIM 3428, which we rejected in section I of this opinion. Belfield speculates that the jury's broadly framed query about the mental health evidence and the court's decision not to elaborate on the instructions "largely eliminated any possibility that the jury would apply the mental health evidence in a fair and accurate way." But "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland*, *supra*, 466 U.S. at p. 693.) "A defendant must prove prejudice that is a " 'demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) Belfield has not done so. His claim of ineffective assistance of counsel fails.

*Belfield*, 2018 WL 6251390, at *8-10.

The court of appeal found Petitioner's underlying claim procedurally defaulted because defense counsel agreed to the manner in which the judge handled the jury's question. The Court, in its discretion, denies this claim on the merits. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (federal habeas court may bypass question of procedural default to deny claim on merits).

Petitioner argues that the trial court erred by not further instructing the jury or allowing follow-up questions after their initial inquiry. However, it was well within the trial court's discretion to tell the jury it had all the instructions it needed. The Ninth Circuit has explained that a trial judge has "wide discretion" in responding to questions from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003). Therefore, even if a court's response is not the only course available, the court acts "within its discretion by simply referring the jury to the instructions they had already been given." *Id.* at 995 (citing *Davis v. Greer*, 675 F.2d 141, 145-46 (7th Cir. 1982)) (where the "entire jury charge clearly and correctly stated the controlling law," and the trial court responded to a jury question by saying only, "[c]onsider all of the instructions carefully," the "trial court's response was sufficiently specific to clarify the jury's confusion.").

Here, before responding to the jury's question, the trial judge conferred with the attorneys, and, noting the ambiguity in the question and the real possibility of influencing the jury's deliberations, used his discretion and determined that the best course of action was to refer to the

1   original instructions.  There was nothing improper about this response.  *See Johnson*, *supra*, 351

2   F.3d at 944.  Petitioner's claim relating to the jury question is without merit.

3          Regarding the claim of ineffective assistance of counsel, the Sixth Amendment guarantees

4   the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend.

5   VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive

6   a defendant of the right by failing to render adequate legal assistance.  *Strickland v. Washington*,

7   466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment ineffectiveness of counsel

8   claim, the defendant must establish two things.  First, the defendant must establish "that counsel's

9   representation fell below an objective standard of reasonableness."  *Id*. at 687-88.  Second, the

10  defendant must establish that he was prejudiced by counsel's deficient performance, i.e., that

11  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

12  proceeding would have been different."  *Id*. at 694.  On habeas review, it is not enough for a

13  federal court to find counsel ineffective.  The federal court must also find that the state court's

14  resolution of the issue was unreasonable, a higher standard.  *Harrington*, 562 U.S. at 101.

15         The state court's holding that there was no prejudice under *Strickland*'s second prong was

16  not objectively unreasonable.  As noted above, to establish prejudice, Petitioner must show "a

17  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

18  would have been different."  *Strickland*, 466 U.S. at 694.  This would require Petitioner to show a

19  reasonable probability that if counsel had objected and the judge responded in some other manner

20  to the jury's question, the verdict would have changed.  The state court's conclusion that Petitioner

21  failed to make this showing — because it is simply too speculative to presume what other action

22  the trial judge might have taken had counsel intervened, and what effect it may have had on the

23  jury — was not objectively unreasonable.  The state court's denial of this claim was not contrary

24  to or an unreasonable application of Supreme Court authority, or an unreasonable determination of

25  the facts.  Habeas relief is denied on Claim No. 2.

26      **3.  Claim No. 3: Prosecutorial Misconduct**

27         In Claim No. 3, Petitioner argues that the prosecutor committed misconduct at closing

28  when arguing to the jury that it should disbelieve Petitioner's self-defense testimony because he

failed to tell the police that he fired at the victim in self-defense.  Dkt. No 1 at 17-19.  Petitioner

argues that the prosecutor's statement was in violation of *Griffin v. California*, 380 U.S. 609

(1965) and *Doyle v. Ohio*, 426 U.S. 610 (1976).  *Id.*

The California Supreme Court summarily rejected this claim.  The California Court of

Appeal rejected this claim as follows:

> Belfield contends the prosecutor committed misconduct "when he argued to the jury regarding Appellant's failure to assert self-defense when initially questioned by the police.  That was misconduct because Appellant exercised his right to silence when he declined to speak to the police."  We disagree.
>
> **Background**
>
> Before trial, Belfield moved to exclude evidence that he invoked his *Miranda* [FN] rights or otherwise declined to speak to police after his arrest.  The prosecutor acknowledged that "normally that's a tried and true rule," but argued Belfield's invocation was admissible to show "his mental state and what his mental abilities were" in light of the anticipated defense based upon his mental illness.  The trial court commented, and the prosecutor agreed, that the argument was premature and should, if appropriate, be raised on rebuttal after the defense presented its case.
>
> In rebuttal argument, the prosecutor urged the jurors to evaluate Belfield's mental state by focusing on his actions before, during and after the shooting.  He argued:
>
> "Got a gun; that's an action.  Went out looking for these guys; that's an action that's inconsistent with self-defense.  He got a mask, a mask, concealed his identity; that's completely inconsistent with I'm just going out there to defend myself.
>
> "He went to Hudson Court even though he believed that the people were there that were dangerous.  That's completely inconsistent with honest and reasonable self-defense.  Being in the back seat of a car making that decision: I'm not going in the front seat anymore.  We are going to Hudson Court where these guys were at.  I'm going in the back seat; completely consistent with a drive-by shooting.  This is not self-defense.  None of his actions speak to that.
>
> "What about what happened afterwards?  What are those actions?  Actions will guide you.  Shotgun out the window; inconsistent with an honest and good faith belief that you acted in self-defense.  Car crashed, pretends to be asleep; he took that action.  That's inconsistent with an honest and good faith belief in self-defense.
>
> "*Putting up another defense of insanity, the changing and varying defense; completely inconsistent with an honest and good faith belief in self-defense.  If it's self-defense, it's the first thing you say.  That's the first thing you say.*" (Italics added.)  At that point Belfield's

attorney interjected, "[o]bjection, Your Honor. *Griffen-Doyle*." The court held a sidebar conference and the prosecutor moved on to other topics.

After the jury was instructed and left the courtroom, Belfield argued that the prosecutor's comment, "[t]hat's the first thing you say," was "an obvious *Griffen-Doyle* violation" and requested a mistrial. The prosecutor explained that his comment was directed to Belfield's comments in the recorded call to Saunders "where the defendant initially said in that phone call that he's going to go insanity. Said it two different times. [¶] Then his girlfriend, Ms. Saunders at the time, talked about accident, and I spoke to the newspaper, and I told them it was an accident. The defendant's specific response was: 'If I can't get up from under what I'm trying to get under, that's going to work,' meaning insanity doesn't work, we are going to try that accident thing. That's what I was commenting on." The trial court denied Belfield's mistrial motion.

**Analysis**

*Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) "prohibits the prosecution from impeaching a defendant's trial testimony with evidence of the defendant's silence after the defendant, having been advised of his constitutional rights under [*Miranda*], chooses to remain silent." (*People v. Earp* (1999) 20 Cal.4th 826, 856.) Assuming arguendo that *Doyle* applies to prohibit a comment in a prosecutor's closing argument (*see People v. Seumanu* (2015) 61 Cal.4th 1293, 1334 & fn. 10), there was no *Doyle* error. "For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that ' "the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Winbush* (2017) 2 Cal.5th 402, 480; *People v. Centeno* (2014) 60 Cal.4th 659, 667.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

No such inference arises here. No evidence was introduced that Belfield invoked his *Miranda* rights when he was apprehended by the police, so it seems highly improbable that the jury would have interpreted the challenged comment as referring to an exercise of those rights. Rather, the jury was far more likely to have understood the prosecutor's comment to refer to Belfield's stated intent to "go insanity," e.g., rely on an insanity defense, or, if that did not work, claim the shooting was an accident. The prosecutor said as much earlier in closing argument that Belfield's initial stories were inconsistent with self-defense: "The defendant's story is first he pretends to be asleep. Then he claimed insanity in the jail call. And then here now at trial, he's agreeing with [Saunders's] rendition of this phone call that it is some sort of accident. [¶] ... [¶] These are not the actions of an innocent man. These are not the actions of someone who believes in his own mind he was acting [in] self-defense." This record provides no basis to infer the jury construed the comment as referring to an invocation of *Miranda* rights for which they had no evidence.

*Belfield*, 2018 WL 6251390, at *13-14.

The state court's denial of this claim was not unreasonable.[4]  Under *Doyle*, a defendant's silence "at the time of arrest and after receiving *Miranda* warnings" cannot be used to impeach him should he choose to testify at trial.  426 U.S. at 619.  As the court of appeals reasonably explained, it is unlikely the jury would have understood the prosecutor's challenged comment to be referring to Petitioner's post-invocation silence, because no evidence was presented as to when Petitioner invoked *Miranda*.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.")

Furthermore, any possible error did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 623 (citation omitted).  The challenged comment was one arguably ambiguous sentence in a lengthy closing argument.  In addition, the judge instructed the jury that nothing that the attorneys said was evidence, Dkt. No. 18-9 at 60.  The state courts' rejection of Petitioner's *Doyle* claim was neither contrary to nor an unreasonable application of Supreme Court precedent.  Habeas relief is denied on Claim No. 3.

### 4.  Claim No. 4: Instructional Error & Ineffective Assistance of Counsel

In Claim No. 4, Petitioner alleges that that trial court erred in its instructions to the jury regarding self-defense and imperfect self-defense because the judge failed to recite a pinpoint instruction relating to being harmed in the past.  Dkt. No. 1 at 20.  Petitioner also argues that counsel was deficient in failing to request the pinpoint instruction.

The California Supreme Court summarily rejected the claims.  The California Court of Appeal rejected the claims as follows:

> Belfield contends the standard instructions given on self-defense and imperfect self-defense were erroneous because they omitted optional language concerning prior threats.  Specifically, he asserts the court should have instructed the jury that a person who was previously

---

[4] .  While the state appellate court did not reference *Griffin* specifically, the case is not relevant. *Griffin* ruled that "[t]he Due Process Clause prohibits a prosecutor from commenting on a defendant's decision not to testify."  *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006).  Here, Petitioner testified at trial.

United States District Court
Northern District of California

threatened or harmed by another is justified in acting more quickly or taking greater self-defense measures against that person.  This issue, too, was forfeited by trial counsel's failure to object or request the optional language, and again Belfield's assertion of ineffective assistance of counsel fails because he can show no prejudice.

**Background**

The prosecution proposed adding pinpoint language to the instruction on self-defense (CALCRIM No. 505) to clarify that the concept of a "reasonable person" does not mean "a reasonable person with schizophrenia."  Belfield's counsel objected to the prosecutor's proposed language, stating that "the instruction as it is is sufficient.  I think we should be very cautious about altering it.  I don't know that it's a correct—in my reading of *Jefferson*, [FN] I don't know that that is the correct language.  I think the correct language is what is stated in the instruction.  I would ask the Court to leave it as it is."

The court instructed the jury with CALCRIM No. 505 in pertinent part as follows: "The defendant acted in lawful self-defense or defense of another if: One, the defendant reasonably believed that he or someone was in imminent danger of being killed or suffering great bodily injury; two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and three, the defendant used no more force than was reasonably necessary to defend against that danger.

[¶] ... [¶]

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that he or someone else was threatened may be reasonable even if he relied on the information that was not true.  However, the defendant must actually and reasonably have believed that the information was true."

Neither party requested the following optional paragraph from CALCRIM No. 505, and it was not given: "Someone who has been threatened or harmed by a person in the past, is justified in acting more quickly or taking greater self-defense measures against that person."

The court instructed the jury on imperfect self-defense that: "The defendant acted in imperfect self-defense ... if ... One, the defendant actually believed he was in imminent danger of being killed or suffering great bodily injury; and two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable.... [¶]

"In evaluating the defendant's beliefs, consider all the circumstances

as they were known and/or appeared to the defendant."

**Analysis**

"The court has a sua sponte duty to instruct on defenses when " 'it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " [Citation.] Yet this duty is limited: 'the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. [Citation.]  Thus, the court is required to instruct sua sponte only on general principles which are necessary for the jury's understanding of the case.  It need not instruct on specific points or special theories which might be applicable to a particular case, absent a request for such an instruction.' [Citations.] Alternatively expressed, *'[i]f an instruction relates "particular facts to the elements of the offense charged," it is a pinpoint instruction and the court does not have a sua sponte duty to instruct.'* " (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489 (*Garvin*), italics added; People v. Saille (1991) 54 Cal.3d 1103, 1119.)

The language Belfield asserts should have been included in the instructions is a pinpoint instruction.   (*Garvin*, *supra*, 110 Cal.App.4th at pp. 488-489 ["[t]he issue of the effect of antecedent assaults against defendant on the reasonableness defendant's timing and degree of force highlights a particular aspect of this defense and relates it to a particular piece of evidence.  An instruction on the topic of antecedent assaults is analogous to a clarifying instruction."].) Belfield did not request that the instructions on self-defense or imperfect self-defense be amplified to include the pinpoint language, so this claim is forfeited for appeal. " '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "   (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901, abrogated on another point in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; *People v. Lang* (1989) 49 Cal.3d 991, 1024.)

We also reject Belfield's contention that his attorney's failure to request this language in the self-defense and imperfect self-defense instructions constituted ineffective assistance.   The jury was instructed to consider all of the circumstances as they were known or appeared to Belfield.  Those circumstances, if the jury believed Belfield's testimony, included the earlier shooting at Hudson Court and his belief that the shooters were coming after him.  Belfield testified he was worried because the men who shot at them had been driving around the neighborhood, that he fired the gun because he "thought it was the same guys that shot at us a few days ago" and that they were going to harm him and the others "[b]ecause they already shot at me once."   Defense counsel argued that after the earlier shooting incident at Hudson court Belfield was afraid the same men were coming after him and his companions.  " [T]here's my client, heading back into a dangerous situation, ... knowing that the threat is going to be there. [¶] And within seconds of getting into that court, seconds, he pulls that trigger.  So under all of those circumstances, that's what you have to consider.  You have to decide whether was

United States District Court
Northern District of California

1   that the reasonable thing to do to act in self-defense when you realize
    that someone is running up on your car, *you've been shot at before*
2   ....." (Italics added.)  On this record, there is no reasonable possibility
    the jury did not consider the possible significance of the purported
3   prior shooting in assessing whether Belfield shot Monico in
    reasonable or unreasonable self-defense.  Accordingly, there is no
4   reasonable possibility defense counsel's failure to request the
    pinpoint language affected the verdict.

5   *Belfield*, 2018 WL 6251390, at *11–12.

6       Once again, the court of appeal found this claim procedurally defaulted.  The Court, in its

7   discretion, denies this claim on the merits.  *See Lambrix*, *supra*, 520 U.S. at 525.  A criminal

8   defendant is entitled to adequate instructions on the defense theory of the case.  *See Conde v.*

9   *Henry*, 198 F.3d 734, 739 (9th Cir. 2000).  However, the defendant is not entitled to have jury

10  instructions framed in his or her preferred terms where the given instructions adequately embody

11  the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).  The omission

12  of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v.*

13  *Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155

14  (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction

15  bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997)

16  (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of such an instruction

17  may be evaluated by comparison with the instructions that were given.  *Murtishaw v. Woodford*,

18  255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).  An instructional error is

19  considered harmless unless there is a "reasonable probability" that the jury would have arrived at a

20  different verdict had the instruction been given.  *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009).

21      Petitioner contends that the trial court erred in failing to instruct the jury on the additional

22  pinpoint instruction which provides that past threats or harm by a person can justify taking greater

23  self-defense measures against that person.  However, even if the pinpoint instruction had been

24  given, it is not reasonably probable that the verdict would have changed.  *See Byrd*, 566 F.3d at

25  860.  The self-defense instructions directed the jury to consider "all of the circumstances" as they

26  were known or appeared to Petitioner.  At trial, Petitioner recounted details of being shot at prior

27  to the events in this case, and testified that he feared the same people were coming to harm him.

28  *See* Dkt. No. 18-6 at 24, 31. 55.  Defense counsel reiterated this point at closing:

United States District Court
Northern District of California

So the next thing I want to address is, then, what reasonable interpretation is there of the facts that happened that night.  My client acted in self- defense of himself or others.  You have to take all of the circumstances that he finds himself in.

. . .

He finds himself on that day confronted with a fact we don't know exactly -- at some point in the afternoon, the two guys who attacked them a few days before . . . are there again.

. . .

So they got back to the scene.  They go back to Hudson Court.  My client is not saying anything. . . . She decides to go back, and there's my client, heading back into a dangerous situation, back into a dangerous situation, knowing that the threat is going to be there.

And within seconds of getting into that court, seconds, he pulls that trigger.  So under all of those circumstances, that's what you have to consider.  You have to decide whether was that the reasonable thing to do to act in self- defense when you realize that someone is running up on your car, you've been shot at before, you don't know who it is, you are in a dangerous, dark place, and you don't know who it is.  That person was wearing dark clothes.  Has gloves on even.

Dkt. No. 18-9 at 33, 35.

Despite Petitioner's testimony, the jury still found him guilty of murder.  The additional pinpoint instruction was simply a more precise way of telling the jury to consider past threats, which was cumulative of the given instructions and would not have changed the result of the jury's verdict.  That Petitioner would have preferred to have the additional pinpoint instruction given is insufficient on habeas.  *See Henderson*, 431 U.S. at 156-57 (failure to give an instruction that is cumulative to other provided instructions does not present a basis for federal habeas relief).  Habeas relief must be denied on Petitioner's claim of instructional error.

With respect to Petitioner's claim that counsel was deficient in failing to request the pinpoint instruction, the state appellate court reasonably concluded that Petitioner failed to show prejudice.  As noted above, the self-defense instructions directed the jury to consider all relevant circumstances, and defense counsel reviewed the evidence she found pertinent at closing.  On this record, the state court was not unreasonable in concluding that the outcome would not have changed had the pinpoint instruction been given.  The state court's denial of this claim was neither contrary to or an unreasonable application of Supreme Court authority, or an unreasonable

determination of the facts.  Habeas relief is denied on Claim No. 4.

## IV.    CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States Court of Appeals.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:    12/29/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California